PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAE LAMAR WIGGINS, a/k/a Rae
Carruth,

*Petitioner-Appellant,*

v.

BONNIE BOYETTE,

*Respondent-Appellee.*

No. 09-6484

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:05-cv-00346-GCM)

Argued: October 26, 2010

Decided: February 15, 2011

Before WILKINSON and MOTZ, Circuit Judges,
and Damon J. KEITH, Senior Circuit Judge of the
United States Court of Appeals for the Sixth Circuit,
sitting by designation.

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge Wilkinson and Senior Judge Keith joined.

## COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for

Appellant. Mary Carla Hollis, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Roy Cooper, Attorney General, Clarence Joe DelForge, III, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After a lengthy trial, a North Carolina jury convicted Rae Lamar Wiggins, a.k.a. Rae Carruth ("Carruth"),[1] of conspiracy to commit the murder of his pregnant girlfriend, Cherica Adams, use of an instrument to destroy their unborn child, and discharge of a firearm into occupied property. Carruth failed to obtain reversal on appeal, *see State v. Wiggins*, 584 S.E.2d 303 (N.C. Ct. App. 2003), *disc. rev. denied*, 588 S.E.2d 472 (N.C. 2003), *cert. denied*, 541 U.S. 910 (2004), or any post-conviction relief in state court. He then filed this petition for a writ of habeas corpus. Carruth maintains that the state trial court's decision to admit evidence of certain statements made by Ms. Adams before she died mandates habeas relief. For the reasons that follow, we affirm the district court's denial of the writ.

I.

We first set forth the facts as recounted by the North Carolina Court of Appeals, *Wiggins*, 584 S.E.2d 303, then briefly summarize the procedural history of the case.

---

[1]Because all witnesses referred to the defendant as Carruth, we do so in this opinion.

### A.

On the evening of November 15, 1999, Carruth and Ms. Adams—then twenty-four years old and eight-months pregnant with Carruth's child—went to a movie together at a theater in Charlotte, North Carolina. After the movie, the two rode together to Carruth's house to pick up Ms. Adams's car. At his house, Carruth used his cell phone to call Michael Kennedy and told Kennedy that he and Ms. Adams were about to leave. Carruth and Ms. Adams then drove separate cars toward Ms. Adams's home.

The murder unfolded on Rea Road, a two-lane residential street. Carruth led in his car, and Ms. Adams followed in hers. Kennedy, accompanied by passengers Stanley Abraham in the front seat and Van Brett Watkins in the backseat, followed Ms. Adams in a rental car. As the three cars drove down the street, Carruth slowed or stopped his large sport utility vehicle in front of Ms. Adams's car, forcing her to slow or stop her car. Kennedy then drove his rental car beside Ms. Adams's car, and Watkins fired five shots into her car, wounding her once in the neck and three times in the back. Carruth's and Kennedy's vehicles fled the scene in different directions.

The shots did not kill Ms. Adams immediately. Rather, at 12:31 a.m., she called 911 from her cell phone and spoke to an emergency dispatcher for over twelve minutes until an ambulance arrived. During that call, Ms. Adams told the 911 dispatcher that: (1) she was eight months pregnant and had been shot while driving her car; (2) she had been following "her baby's daddy," Rae Carruth, on Rea Road; (3) Carruth had called somebody from his house before they left; (4) Carruth slowed his car down in front of her; (5) another car then pulled up beside Ms. Adams's car; (6) somebody from that other car shot her; and (7) after she was shot, Carruth "just left" the scene of the shooting.

At around 12:43 a.m., Mecklenburg Police Officer Peter Grant arrived on the scene. Officer Grant conducted an on-

scene interview with Ms. Adams in which she identified Carruth as the driver of the vehicle that slowed in front of her. At 1:10 a.m., an ambulance delivered Ms. Adams to the Carolinas Medical Center. There, in an interview with Officer Grant, Ms. Adams gave a chronology of the events, explaining that: (1) she and Carruth went to the movies together and returned to Carruth's house to retrieve her car; (2) she followed Carruth down Rea Road; (3) Carruth came to a stop; and (4) she couldn't go around Carruth on the two-lane Rea Road. When Officer Grant asked Ms. Adams if "your boyfriend [did] this to you," she "nodded her head '[y]es.'"

At 4 a.m., doctors moved Ms. Adams to a trauma intensive care unit. At 7 a.m., Ms. Adams had an endotracheal tube inserted into her throat. Traci Willard, the attending nurse at the time, asked Ms. Adams if she remembered what had transpired. Ms. Adams nodded and motioned the nurse to bring her a pen and paper. In her own handwriting, Ms. Adams again described that night's events, including Carruth's actions. Soon after communicating with Nurse Willard, Ms. Adams went into a coma until she died a month later on December 14, 1999. Her baby son survived but suffered brain damage.

On November 25, 1999, the State arrested Carruth and charged him with offenses related to the shooting; Carruth posted bond and was released on bail on the condition that he remain in the city. When Carruth learned of Ms. Adams's death on the afternoon of December 14, 1999, however, he fled. The State then issued a warrant for Carruth's arrest on murder charges. The FBI found Carruth the next day in the trunk of a friend's car in Tennessee.

## B.

The State charged Carruth with first degree murder of Ms. Adams, conspiracy to commit that murder, discharging a firearm into occupied property, and using an instrument to

destroy an unborn child. The State also charged co-conspirators Kennedy, Watkins, and Abraham with crimes related to the murder of Ms. Adams. Carruth was tried alone before a death-qualified jury. The trial continued over six weeks and consumed more than twenty-five trial days.

In its case in chief, in addition to Ms. Adams's statements detailed above, the State offered numerous exhibits and the testimony of over twenty witnesses, including co-conspirator Michael Kennedy, to establish Carruth's orchestration of Ms. Adams's murder. Through cross-examination, the defense attempted to establish that Ms. Adams was shot because of Carruth's coconspirators' rage when he refused to finance a drug deal. The defense offered forty-five witnesses who testified that Carruth had good character and a gentle nature, that he was looking forward to the birth of his and Ms. Adams's child, and that his bright career as a professional football player with the Carolina Panthers gave him the means to pay child support. In rebuttal, the State offered the testimony of two of Carruth's former girlfriends. Both testified as to Carruth's anger when each of them became pregnant with Carruth's child, his unwillingness to pay child support, and his threats of violence to them.

After two and a half days of deliberations, the jury indicated in a note to the trial judge that it was divided on all charges and wished instruction. In model language, not challenged by Carruth (and less coercive than that approved in *Allen v. United States*, 164 U.S. 492 (1896)), the judge instructed the jury to deliberate further. After another day, it returned its verdict—acquitting Carruth of first degree murder but finding him guilty of conspiracy to commit murder, discharge of a firearm into occupied property, and use of an instrument to destroy an unborn child. The court sentenced Carruth to 245 months imprisonment for the conspiracy conviction plus two consecutive terms of 31 to 47 months for the remaining two convictions.

On appeal, the North Carolina Court of Appeals found error in the trial court's decision to admit into evidence Ms. Adams's handwritten notes to Nurse Willard. *Wiggins*, 584 S.E.2d at 308-09. But, "[g]iven the nature and extent of the State's evidence implicating defendant's involvement in the shooting," the state appellate court concluded that such error was harmless and upheld the conviction. *Id.* at 310. The State Supreme Court denied discretionary review and the Supreme Court of the United States denied certiorari. *See Wiggins*, 588 S.E.2d 472, *cert. denied* 541 U.S. 910.

Carruth filed a Motion for Appropriate Relief (MAR) in state court, claiming that the trial court's admission of Ms. Adams's statements to Officer Grant (in addition to those to Nurse Willard) violated his Sixth Amendment Confrontation Clause rights. The MAR court agreed, finding that the trial court had erroneously admitted all three of these statements in violation of Carruth's constitutional rights under the Confrontation Clause. But the MAR court held that such violations were "harmless beyond a reasonable doubt" and so upheld the conviction. The North Carolina Court of Appeals denied Carruth's request for review.

Carruth then filed this habeas petition in federal court, reprising, among other claims, the Confrontation Clause challenge. The district court denied habeas relief but granted a certificate of appealability as to the Confrontation Clause claim. Carruth asked us to expand the certificate of appealability to consider whether *Blakely v. Washington*, 542 U.S. 296 (2004), should be applied retroactively to his sentence; we denied that motion. Accordingly, the sole issue before us is whether the Confrontation Clause error requires the grant of habeas relief.

II.

We initially recognize the extent and limit of the asserted constitutional error at issue here. On one hand, Carruth does

not contend before us that admission of the 911 call (both playing the recording and publishing the transcript) violated his Sixth Amendment Confrontation Clause rights. *See Davis v. Washington*, 547 U.S. 813 (2006). On the other hand, the State does not contend before us that admission of Ms. Adams's two statements to Officer Grant—one at the crime scene and one at the hospital—and her handwritten notes to Nurse Willard did not violate Carruth's Sixth Amendment rights. *See Crawford v. Washington*, 541 U.S. 36 (2004). Because it makes no difference to our resolution of this case, we assume without deciding that Carruth and the State accurately assess the constitutionality of Ms. Adams's statements, i.e., that admission of her statements to Officer Grant and Nurse Willard amounted to constitutional error but admission of the 911 call did not.

Of course, as Carruth correctly recognizes, such error does not automatically entitle a petitioner to a grant of a writ of habeas corpus. Instead, a habeas court reviews such error for harmlessness. *See Gutierrez v. McGinnis*, 389 F.3d 300, 302-03 (2d Cir. 2004) (Sotomayor, J.); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The Supreme Court explained in *Brecht v. Abrahamson* that, in determining the harmlessness of a state court's constitutional error in a criminal trial, a federal habeas court asks whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

Courts have recently disagreed as to whether enactment of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), changes that standard. Some courts have concluded that AEDPA requires a federal habeas court to apply both *Brecht and* the deferential standard of review contained in AEDPA to a state court's harmless error determination; others have held that the *Brecht* harmless-error standard alone governs habeas review. *Compare Johnson v. Acevedo*, 572 F.3d 398 (7th Cir. 2009) *with*

*Ruelas v. Wolfenbarger*, 580 F.3d 403 (6th Cir. 2009). We have recently held that, in light of *Fry v. Pliler*, 551 U.S. 112, 120 (2007), even post-AEDPA, a federal habeas court need only apply the *Brecht* standard to evaluate the harmlessness of constitutional error in a state trial. *See Bauberger v. Haynes*, ___ F.3d ___, No. 09-8111, at 9 (4th Cir. 2011).

Carruth vigorously contends that the *Crawford* error in his case meets the *Brecht* standard. Indeed, he contends that the three improperly admitted statements (which consumed less than a day of this lengthy trial, in which the jury properly considered Ms. Adams's 911 call and evidence of numerous admissions by Carruth) constitute the "centerpiece of the state's case." Appellant's Br. at 18. According to Carruth, the state's "primary evidence included and flowed from" the improperly admitted evidence. *Id.* at 21. Accordingly, Carruth maintains that the State "*cannot carry its burden* of proving that" the decision to admit the challenged statements "did not have a substantial and injurious" effect on the jury's verdict. Appellant's Br. at 33 (emphasis added); *see also id.* at 39, 41.

We note at the outset that Carruth misstates the governing standard of review. The Supreme Court has "deliberately" refused to "phrase" the *Brecht* standard "in terms of 'burden of proof.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Instead, a court must ask, "Do [we], the judge[s], think that the error substantially influenced the jury's decision?" *Id.* If a court finds itself in "grave doubt" about whether a trial error is harmless, it must grant habeas relief. *Id.* at 435. A "grave doubt" exists when "in the judge's mind, the matter is so evenly balanced that he [or she] feels . . . in virtual equipoise as to the harmlessness of the error." *Id.* at 435. If a habeas court finds itself without any grave doubt as to the harmlessness of error, it must deny habeas relief.

Applying the correct standard in assessing harmlessness in cases involving Confrontation Clause error, we consider "a host of factors." *Van Arsdall*, 475 U.S. at 684. These include

"the importance of the [improperly admitted] witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

### III.

With these principles in mind, we turn to analysis of Carruth's contentions. In doing so, we consider the factors set forth in *Van Arsdall* to determine if the three statements erroneously admitted in violation of Carruth's Confrontation Clause rights—both individually and taken together—require the grant of habeas relief.

### A.

As to the importance of the improperly admitted statements, Carruth contends that they formed the "focal point" of the prosecution's case. Appellant's Br. at 16. In support of this contention, he maintains that the prosecution heavily relied on these statements in its opening and closing statements by describing Ms. Adams's role as an "eyewitness" to the crime and her testimony as "a voice" telling "her message." *Id.* at 19. This argument ignores the most critical evidence in this case, the twelve-minute 911 call—an extremely powerful and unchallenged account provided by Ms. Adams in her actual "voice." *Id.* Carruth himself now not only fails to dispute that the trial court properly admitted the 911 call but also concedes that it "had great visceral impact." *Id.* at 32.

In the 911 call, immediately after being shot, Ms. Adams related:

> [MS. ADAMS]:  Police, I've been shot. I've been shot.

911:   You've been shot? Where are you at Ma'am?

\*\*\*

[MS. ADAMS]:   I passed Calvary Church on the . . .

911:   Calvary Church

[MS. ADAMS]:   Ah, no . . .

911:   You're where? Talk Ma'am, I —

[MS. ADAMS]:   On Rea Road

\*\*\*

MEDIC:   Okay. How did this happen?

[MS. ADAMS]:   I was following my baby's daddy, Rae Carruth the football player.

MEDIC:   So you think he did it?

[MS. ADAMS]:   He slowed down. And, a car pulled up beside me.

MEDIC:    And then shot at you?

[MS. ADAMS]:   Yes.

\*\*\*

[MS. ADAMS]:   And before—and before we left, he called somebody from his house.

\*\*\*

MEDIC:   Where's your husband at?

[MS. ADAMS]:   I don't have one.

MEDIC:   Or your boyfriend? The one that you said was with you. Where's he at?

[MS. ADAMS]:   He was in the car in front of me and he slowed down and somebody pulled up besides me and did this.

MEDIC:   And then where'd he go?

[MS. ADAMS]:   He just left.

MEDIC:   Okay. All right. What's his name?

[MS. ADAMS]:   Rae Carruth, he plays for the Panthers.

***

MEDIC:   Okay. All right. You got an officer close. [Speaking to the medic] Did you hear what she said about that boyfriend?

911:   [Repeating what Ms. Adams told her] I got his name was Rae Carroso [sic]. He's in a white Expedition. With a tag Mary Sam Nora, something, something, 77.

***

911:   Ma'am. I hate to do this to you. But, when you last saw this Ford, when you last saw this car, which way was it going? What road?

[MS. ADAMS]:   Straight down Rea Road.

Thus, Ms. Adams's 911 call offered the State an extremely powerful first-hand account of the crime by the victim herself. The State proceeded to make full use of this abundant testimonial resource. The prosecutor began his opening statement with a description of the call and a promise to the jury that it would hear Ms. Adams herself "hold on and use her cell phone to call 911" and "tell the 911 operator" about the attack on her. At trial, the prosecutor made good on this promise. At the very outset, before introduction of any of the improperly admitted statements, the State focused on the crucial 911 call. The prosecutor properly authenticated the tape of the call through testimony from both the 911 operator and the medic dispatcher. Then, after the trial court admitted the tape into evidence, the prosecutor played the 911 call to the jury in open court. Finally, the prosecutor distributed a transcript of the 911 call to the jurors.

The statements to Officer Grant and Nurse Willard were only admitted later, in less than a day, in this lengthy trial. They may have enhanced Ms. Adams's testimony, but the substantial focus on, and probative weight of, the 911 call overwhelmed the importance of these statements. It was the 911 call that turned Ms. Adams into the important "eyewitness" that she was, a person who gave a near-contemporaneous "voice" to the night's tragic events.

## B.

Moreover, the record belies Carruth's contention that the improperly admitted evidence was not cumulative. Standing alone, without these improperly admitted statements, the 911 call established the critical elements of the State's case against Carruth: (1) before Carruth and Ms. Adams left his house, Carruth called somebody; (2) Ms. Adams followed Carruth down Rea Road, with Carruth driving his white Ford Expedition in front of her smaller car; (3) Carruth slowed down; (4) a car pulled up beside Ms. Adams's car and some-

body shot her; and then (5) after she was shot, Carruth "just left" the scene.

Additionally, the State called Ms. Adams's cousin and roommate to testify that she received a call from Ms. Adams just prior to the shooting, at around 12:15 a.m. In the call to her cousin, Ms. Adams said that she and Carruth were "on their way over to the apartment," would be there in 15 minutes, and asked that the apartment be "straighten[ed] up" because Ms. Adams had not "expect[ed] him to come over."

Furthermore, co-conspirator Michael Kennedy testified at length, without the benefit of a plea agreement, to all of the facts (and much more) set forth in the improperly admitted statements. According to Kennedy, after he met Carruth in January or February 1999, he socialized with Carruth and visited Carruth's home "a lot of times." Some hours before the shooting, Carruth elicited his assistance in the plan to kill Ms. Adams. Carruth told Kennedy that he had "got [Ms. Adams] pregnant," that she was trying to "juice him for money," and that "he was already paying like Five Thousand Dollars in child support, and he didn't want to pay another 5,000 in child support." Carruth explained that he had previously paid Van Brett Watkins "to beat up [Ms. Adams] so that she would lose the baby," but Watkins "hadn't done it yet." According to Kennedy, Carruth "was telling me that he was gonna take [Ms. Adams] to the movies, and for me to stay in the area" and await Carruth's phone call. Upon receiving that call, Kennedy was to follow Ms. Adams's car; Watkins was "to do the rest." Carruth then gave Kennedy $100 and told him to "take [Watkins] to get the gun."

Kennedy testified that, at 11:51 p.m., Carruth called to tell him that he and Ms. Adams left the movies. At 12:19 a.m., Kennedy received another call from Carruth in which Carruth told him: "We're getting ready to leave the house." A short time later, after following Ms. Adams (who in turn was following Carruth) down Rea Road, Kennedy testified that:

> Rae [Carruth] went over a hill and then down in the dip. Then, he stopped his car; she stopped behind his; I stopped behind her. Then, Watkins told me to pull up beside her car. So, I pulled up beside her car and he started shooting in her car.

All the while, according to Kennedy, Carruth remained in a "stopped" position. After the shooting, Kennedy testified, Carruth went "straight on Rea Road," just as Ms. Adams told the 911 dispatcher.

Ms. Adams's father also offered evidence duplicating the improperly admitted evidence and corroborating Kennedy's testimony that Carruth stopped his car to facilitate the shooting.[2] Ms. Adams's father testified that when he asked Ms. Adams at the hospital whether Carruth had a legitimate reason to stop, due to a stoplight or stop sign, Ms. Adams shook her head "no"—that no stoplight or stop sign caused Carruth to stop.

In addition, a friend of Carruth's, Candace Smith, also presented testimony duplicative of the improperly admitted evidence. Smith related that, in the early morning of November 16, 1999, at the hospital, just after Ms. Adams had been shot, Carruth told her that he "wished that [Ms. Adams] would die." When Smith asked Carruth if he was involved, Carruth "went into like a deep trance; and, he wouldn't even look at me." According to Smith, Carruth said that he "hit his brakes, in his car, to slow [Ms. Adams's] car down" and witnessed the

---

[2]The parties dispute whether Carruth slowed down or stopped. Possibly he both slowed down *and* then stopped. In the 911 call, Ms. Adams said that Carruth slowed down; in the improperly admitted statements to Nurse Willard and Officer Grant and the uncontested statement of her father, she said that he stopped. This makes little difference given the testimony of a forensic pathologist that slowing down in itself could have facilitated the shooting by helping to align Kennedy's car with Ms. Adams's car.

shooting. Afterwards, Carruth told Smith, he "just drove off and went to" a friend's home.[3]

In sum, the improperly admitted statements, though of course supportive of the State's case, constituted mere drops in the sea of evidence offered by the State to show Carruth's guilt and were cumulative of the 911 call and other evidence.

## C.

Next, we assess the extent and nature of corroborating or contradicting evidence as compared with the improperly admitted evidence. Close examination of the record leaves us with the firm conclusion that the same evidence that makes the improperly admitted statements cumulative corroborates them—and nothing in the record contradicts this corroborating evidence.

Carruth asks us to disregard Kennedy's and Smith's testimony. We have reviewed the extensive cross-examination of both witnesses, in which defense counsel effectively explored their biases, their histories, and the inconsistencies between their testimony and prior statements. For example, counsel focused on Kennedy's bias as a co-conspirator seeking favor from the State in exchange for his testimony and highlighted several inconsistencies in Kennedy's effort to place all the

---

[3]Van Brett Watkins, who pled guilty to second degree murder and so avoided the death penalty, had a substantial history of violent criminal activity, and had made a series of inflammatory and inconsistent statements; the State did not call him as a witness at trial. But, after the trial court instructed the jury that Watkins had entered into a plea agreement with the State and that it should examine his testimony "with great care and caution," the defense called Watkins. Watkins corroborated Kennedy's account as to Carruth's motive (unwillingness to pay child support) and role (planning and slowing down or stopping) in the murder. Moreover, phone records introduced by the State showed six calls between Carruth and Watkins on the day of the murder. Stanley Abraham, the last co-conspirator, did not testify at trial.

blame on Carruth who assertedly "forced" Kennedy to partici-
pate. Similarly, defense counsel stressed Kennedy's access to
all the trial testimony, providing him an opportunity to tailor
his testimony to the theory that Carruth designed the whole
scheme. As for Smith, defense counsel pointed to her poten-
tial bias and receipt of use immunity in exchange for her testi-
mony, her delay in coming forward (suggesting a fear of
criminal liability for her involvement in the murder), and her
failure to relate Carruth's asserted admissions at the hospital
to the defense's private investigator in a pre-trial interview.

We have considered all of these efforts at impeachment and
can find no basis for holding that the jury could not credit
Kennedy's and Smith's testimony. Indeed, we have found
nothing in the record contradicting the critical portions of
their testimony. Moreover, other evidence corroborates their
testimony to a significant extent. For example, the State
offered, for corroboration purposes only, an audiotape replay-
ing a police investigator's early interview of Kennedy. In that
interview, Kennedy explained, consistent with his testimony
at trial, the plan as Carruth originally conceived it. Cell phone
records additionally corroborate Kennedy's testimony. Fur-
thermore, Kennedy's testimony accorded with Ms. Adams's
911 call. His testimony completes Ms. Adams's story by
admitting that he drove the car that Ms. Adams witnessed pull
up beside hers, and that Watkins pulled the trigger. It also
confirms Ms. Adams's statement, reinforced by her father's
uncontested testimony, that Carruth slowed his car unexpect-
edly, with no stop sign or stoplight in sight.

### D.

Additionally, we examine the extent of cross-examination
or impeachment of the improperly admitted statements. Car-
ruth insists that the trial court admitted the three statements
not only "without cross-examination," but also "unimpea-
ched." Appellant's Br. at 18. Again the record belies Car-
ruth's claims. Of course, because she had been murdered,

defense counsel could not cross examine Ms. Adams at trial. But the defense could elicit considerable testimony that the shock caused by the gun wounds, pharmacological sedatives, and volatility of memory formation associated with traumatic events rendered Ms. Adams's improperly admitted statements unreliable.

Defense counsel questioned Nurse Willard as to Ms. Adams's mental capacity in the hospital. The nurse elaborated on Ms. Adams's precarious state, recalling her continuous treatment with Versed and Morphine—an anti-anxiety medication and painkiller, respectively—that may have caused a "synergistic effect" on Ms. Adams's central nervous system. On doctor's orders, the nurse eventually put Ms. Adams to sleep with these narcotics, highlighting their potency.

Later in the trial, the jury heard testimony from Dr. Thomason—Ms. Adams's treating physician in the hospital—about the effects of these drugs. Dr. Thomason explained that studies have not conclusively determined the retrograde amnesia effects of Versed—that is, disruption of existing memories formed prior to taking the medication. Dr. Thomason also acknowledged that these medications affect the "awareness" and "wakefulness" of a patient and increase the risks of "suggestibility" and confirmed that Ms. Adams suffered from shock. The defense was thus able to argue that even though Ms. Adams did not lapse into total unconsciousness, she was suffering from certain cognitive impairments that undermined her capacity to accurately recount the shooting.

Defense counsel called Dr. Loftus, a memory expert, to cast doubt on the improperly admitted statements. Dr. Loftus identified specific indications that Ms. Adams's statements to Officer Grant and to Nurse Willard revealed a faulty recollection of the shooting. The doctor explained how the shock of the shooting caused Ms. Adams to misreport a "well-known fact" like the color of Carruth's Expedition. The doctor also

testified that an "atmosphere of suggestion and suspicion" may have contaminated the improperly admitted statements.

Through these witnesses, the defense offered evidence challenging the improperly admitted statements. Carruth's counsel thus drew the jury's attention to Ms. Adams's unstable condition at the time of those statements—a pregnant woman wounded by gun shots, sedated by medication, suffering from shock, and exposed to the atmosphere of suspicion emanating from the police and her family. Accordingly, we do not find that the lack of cross-examination forecloses a finding of harmlessness.

E.

Although not specifically mentioned in *Van Arsdall* as relevant, Carruth argues that "given [1] the continual emphasis placed on [the improperly admitted] statements throughout [Carruth's] trial, [2] the importance of those statements . . . at trial, [3] the substantial impeachment of the state's other witnesses, [and] [4] the strength of the defense," the course of jury deliberations and the compromise verdict demonstrate that the State "cannot carry its burden of proving that the admission of these statements did not substantially affect the . . . verdict." Appellant's Br. at 41.

This argument rests on two faulty premises. First, as noted above, it rests on Carruth's misunderstanding of the proper analysis. The State has no "burden" to prove harmlessness; rather, a habeas court examines the evidence admitted at trial and the trial error and determines whether it has any "grave doubt" as to whether the error was harmless. *O'Neal*, 513 U.S. at 435. Second, and equally fundamentally, Carruth has not established the four predicates on which he relies, i.e., emphasis on the improperly admitted statements, importance of these statements, substantial impeachment of the State's case, and strength of his own defense. Stripped of the faulty premises, Carruth's argument on this point is reduced to the

contention that the length of jury deliberations, need for further instruction, and compromise verdict, in and of themselves, demonstrate that the asserted Confrontation Clause error was prejudicial. This argument fails.

The length of the deliberations here—four days after a trial consuming six weeks—hardly seems untoward and, of course, the need for additional instruction does not signal prejudice. *See, e.g.*, *United States v. Aldridge*, 413 F.3d 829, 833-35 (8th Cir. 2005). This is particularly so given that the trial judge gave a model reinstruction, which was singularly non-coercive and simply explained to the jurors that they should continue to deliberate. They did so and returned after another day of deliberations with a unanimous verdict.[4]

Similarly, that the verdict may be inconsistent—acquittal of first degree murder and conviction on the other counts—does not provide a basis to upend it. *See United States v. Powell*, 469 U.S. 57, 64-65 (1984). Rather, as the Supreme Court has instructed, "[the] most that can be said" of an inconsistent verdict is that "[it] shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." *Id.* at 63 (quoting *Dunn v. United States*, 284 U.S. 390, 393 (1932) (Holmes, J.)).

We recognize that the length of deliberations and an initial impasse may indicate a "difficult case," *see Kennedy v. Lockyer*, 379 F.3d 1041, 1056 n.18 (9th Cir. 2004) (internal quotation omitted), and may in some circumstances support the conclusion that habeas relief is warranted. But a difficult case does not necessarily mean a weak one. *See, e.g.*, *United States v. Valencia*, 600 F.3d 389, 412 (5th Cir. 2010); *United States v. Gilsenan*, 949 F.2d 90, 96 (3d Cir. 1991). And here, given

---

[4]We note that not even Carruth maintains that the jurors' deliberations were infected by any improper external influence. *Cf. United States v. Duncan*, 598 F.2d 839, 866 (4th Cir. 1979).

the abundant evidence outlined above, these facts do not provide support for the grant of a writ of habeas corpus.[5]

F.

Finally, we consider the overall strength of the State's case. Through the admissible evidence described above—including Ms. Adams's 911 call; the testimony from Kennedy, Smith, Ms. Adams's cousin, and her father; and the cell phone records—the State presented a very strong case in chief that Carruth conceived and saw to the murder of Ms. Adams.

Moreover, in its case in chief, the State also presented powerful evidence of Carruth's flight to avoid arrest and his motive for the crime. After being charged with first degree murder of Ms. Adams on December 14, 1999, Carruth fled North Carolina. Executing a warrant for his arrest, an FBI agent found Carruth in the trunk of a friend's car at a Tennessee motel, with $3900, food, and water. From this evidence, the jury certainly could conclude Carruth fled to avoid a charge and conviction for murder. As for motive, Kennedy and Smith testified that Carruth sought to murder Ms. Adams and the child to avoid the sort of child support payments a court had ordered him to pay to the mother of another one of his children and the State also offered evidence that Carruth claimed he could not afford the combined child support payments.

Furthermore, when Carruth's witnesses testified that he welcomed the birth of a new child and that, as a professional football player, he had ample income and no motive to avoid child support, the State produced rebuttal witnesses that cast

---

[5]While a mistrial is not necessary to show prejudice under *Brecht*, we note that unlike the cases on which Carruth so heavily relies, the verdict here did not follow previous mistrials due to deadlocked juries. *See Fry*, 551 U.S. at 122-23 (Stevens, J., concurring); *Kennedy*, 379 F.3d at 1056 n.18.

serious doubt on these claims. Michelle Wright—the mother of Carruth's son, Rae, Jr.—described her difficulties in obtaining child support from an unwilling Carruth. When Carruth refused to pay child support, Wright had to file suit and submit her son to a paternity test to obtain court-ordered relief; only then did Carruth pay any child support. And, after Wright attempted to involve Carruth in their son's life, Carruth "joked" that she should not be surprised if she "got in a fatal car accident."

Another of Carruth's girlfriends, Amber Turner, both substantiated Wright's testimony and testified to a similar threat to her. Turner explained that from 1995 to 1997, when Carruth was refusing to pay child support to Wright for his baby son, and forcing Wright to take him to court, he was giving Turner $500 every month and buying her a Lexus and clothes. Carruth told Turner that he intended to "fix" his blood test to avoid paying child support to Wright. In March 1998, when Turner herself became pregnant with another of Carruth's children, Carruth threatened her—"don't make me send somebody out there to kill you, you know I'd do it." He told Turner to abort their child, which she ultimately did. Turner also identified a four-page letter that Carruth had written her while in prison awaiting trial in this case, which substantially corroborated their close relationship. In the letter, Carruth implored Turner not to talk to the police. Instead, Carruth told Turner to talk to his lawyers and explained "here's what you recall"—that he loved and missed his son, "didn't mind paying child support" and other facts helpful to his case—all of which Turner testified were untrue.

In short, given the admissible 911 call from Ms. Adams and the testimony and documentary evidence outlined above, the three improperly admitted statements, considered both individually and taken together, were almost entirely cumulative. With a wealth of admissible evidence, the State presented an overwhelmingly strong case that Carruth orchestrated a plan to kill Ms. Adams to avoid paying child support and that the

plan unfolded as he had designed it. After Carruth and Ms. Adams left the movies and returned to his house to pick up Ms. Adams's car, Carruth unexpectedly told Ms. Adams he would follow her home and then called Kennedy to alert him that they were on the way. On the drive to Ms. Adams's home, Carruth led her down Rea Road, where Kennedy followed both cars with Watkins as the backseat passenger. Without any legitimate reason to slow or stop, Carruth did slow or stop in the middle of Rea Road, compelling Ms. Adams to do so as well. Kennedy pulled up next to Ms. Adams's car and Watkins fired the gun, striking Ms. Adams with four bullets and fatally wounding her. Carruth fled the scene of the shooting and, when later charged with Ms. Adams's murder, fled the state. Given the overwhelming admissible evidence, we are confident that the asserted Confrontation Clause error did not "substantially influence[ ] the jury's decision." *O'Neal*, 513 U.S. at 436.

## IV.

In sum, we hold that the error asserted here did not produce a "substantial and injurious effect" on the jury's verdict. *Brecht*, 507 U.S. at 637 (internal quotation omitted). Accordingly, the judgment of the district court denying habeas relief is

*AFFIRMED*.