**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-0005

WILLIAM LEROY BARNES,

Petitioner - Appellant,

v.

EDWARD THOMAS, Warden, Central Prison, Raleigh, North Carolina,

Respondent - Appellee.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. Thomas D. Schroeder, Chief District Judge. (1:08-cv-00271-TDS-JEP)

Argued: May 8, 2019                          Decided: September 12, 2019

Before AGEE, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Floyd wrote the opinion in which Judge Thacker joined. Judge Agee wrote a separate dissenting opinion.

**ARGUED:** M. Gordon Widenhouse, Jr., RUDOLF WIDENHOUSE, Chapel Hill, North Carolina, for Appellant. Jonathan Porter Babb, Sr., NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George B. Currin, Asheville, North Carolina, for Appellant. Joshua H. Stein, Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

FLOYD, Circuit Judge:

More than 20 years ago, Petitioner William Leroy Barnes was convicted of murder in North Carolina state court and sentenced to death. Following the trial, Barnes sought to overturn his death sentence, claiming that during sentencing deliberations, a juror improperly consulted with her pastor about whether she could vote to impose the death penalty without running afoul of her religious beliefs. She then relayed his guidance to the entire jury. Barnes' juror misconduct claim made its way through the North Carolina state courts, culminating in a final denial in state post-conviction proceedings. On Barnes' first federal habeas appeal, we held that the post-conviction court violated clearly established federal law by failing to afford Barnes a presumption of prejudice and an evidentiary hearing on his juror misconduct claim, as required by *Remmer v. United States*, 347 U.S. 227, 229 (1954). We remanded for an evidentiary hearing to determine if this error resulted in actual prejudice, thus warranting habeas relief. We now hold that it did.

I.

William Leroy Barnes, an inmate on North Carolina's death row, appeals the district court's second denial of his petition for writ of habeas corpus against Edward Thomas, Warden of the Central Prison in Raleigh, North Carolina (hereinafter the "State"). In 1994, Barnes was convicted of first-degree murder in North Carolina state court for the deaths of B.P. and Ruby Tutterow. After Barnes was found guilty, the trial proceeded to the sentencing phase, where the jury was charged with determining whether Barnes and his two codefendants would be sentenced to death or life imprisonment. During closing arguments of the sentencing phase, an attorney representing Frank Chambers, one of

2

Barnes' codefendants, made religiously charged statements about a juror's choice to impose the death sentence:

> Surely, one among you believes in God, the father, the son, the Holy Ghost, the teachings of Jesus Christ. And if you do, you know that Frank Chambers will have two judgment days. The one he's got today, where you sit as his judge, and you determine what happens with his earthly life. . . . [I]f you are a true believer, you know that he will have a second judgment day. . . . On that day, he will be judged not by the law of man, but by a higher law, the laws of God. . . . If you're a true believer and you believe that Frank Chambers will have a second judgment day, then we know that all of us will too. All of us will stand in judgment one day. And what words is it that a true believer wants to hear? Well done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven. Isn't that what a true believer wants to hear? Or does a true believer want to explain to God, yes, I did violate one of your commandments. Yes, I know they are not the ten suggestions. They are the ten commandments. I know it says, Thou shalt not kill, but I did it because the laws of man said I could. You can never justify violating a law of God by saying the laws of man allowed it. If there is a higher God and a higher law, I would say not. To be placed in the predicament that the State has asked you to place yourself in, is just that. To explain when your soul is at stake. Yes, I know the three that I killed were three creatures of yours, God. And that you made them in your likeness. I know you love us all, but I killed them because the State of North Carolina said I could. Who wants to be placed in that position? I hope none of us. And may God have mercy on us all.

J.A. 1530–33.

These statements were presented with no interjection from the prosecution or the trial court. The next day, the jury recommended that Barnes be sentenced to death. Immediately after the jury returned its sentencing recommendation and exited the

3

courtroom, Barnes' attorney alleged to the trial court that one of the jurors had met with her pastor to discuss the death penalty during sentencing deliberations and had relayed the pastor's counsel to the other jurors. The trial court denied Barnes' request to inquire further into the matter, and Barnes appealed to the Supreme Court of North Carolina. The state supreme court denied relief, holding that Barnes had not proven that the alleged contact between the juror and her pastor prejudiced Barnes or denied him the right to an impartial jury.

In 1999, Barnes sought state post-conviction relief by filing a Motion for Appropriate Relief (MAR) in Rowan County Superior Court (the "MAR Court"), in which he reasserted his juror misconduct claim, among others. With the motion, Barnes presented new information to further corroborate his juror misconduct claim. For example, Barnes introduced a summary of a 1995 interview his direct appeal team conducted with the juror accused of misconduct, Hollie Jordan (hereinafter "Juror Jordan"). Juror Jordan signed the summary and acknowledged that it was an accurate representation of the interview. According to the summary, Juror Jordan was offended by the religiously charged closing arguments, and although she "'did not accept the attorney's argument,' she did notice 'that another juror, a female, seemed visibly upset.'" *Barnes v. Joyner*, 751 F.3d 229, 235 (4th Cir. 2014) (hereinafter *Barnes I*) (quoting interview summary). "'To remedy the effect of the argument, [Juror] Jordan brought a Bible from home into the jury deliberation room' and read a passage to all the jurors, which provided 'that it is the duty of Christians to abide by the laws of the state.'" *Id.* (quoting interview summary).

4

The MAR Court summarily denied Barnes' juror misconduct claim as "procedurally barred and without merit" because the issue had been previously addressed and rejected by the Supreme Court of North Carolina on direct appeal.[1] J.A. 1883. The Supreme Court of North Carolina denied Barnes' request for certiorari review.

In 2008, Barnes filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in which he again raised his juror misconduct claim. Barnes argued that under *Remmer v. United States*, 347 U.S. 227 (1954), he was entitled to a presumption of prejudice and an evidentiary hearing upon presentation of a credible allegation of juror misconduct. A magistrate judge recommended that his juror misconduct claim be denied. After concluding that Barnes' claims did not require a hearing, the district court adopted the magistrate judge's recommendation and denied Barnes' habeas petition. Barnes then brought his first appeal.

On our first review of this case, we concluded that the MAR Court's disposal of Barnes' juror misconduct claim amounted to an unreasonable application of *Remmer v. United States*, 347 U.S. at 229, which "clearly established not only a presumption of prejudice, but also a defendant's entitlement to an evidentiary hearing, when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury." *Barnes I*, 751 F.3d at 242. We

---

[1] N.C. Gen. Stat. § 15A-1419(a)(2) provides that a claim is procedurally barred for purposes of MAR review if, among other things, the issue "was previously determined on the merits upon an appeal from the judgment . . . in the courts of this State or a federal court." However, this provision is not a procedural bar for purposes of federal habeas review. *Brown v. Lee*, 319 F.3d 162, 170 n.2 (4th Cir. 2003).

distinguished Barnes' allegations of juror misconduct from cases in which we have held that an *internal* juror influence—*i.e.*, a juror's own bias or communication with fellow jurors—does not implicate a defendant's Sixth Amendment right to an impartial jury. *Id.* at 245–46; *see also Robinson v. Polk*, 438 F.3d 350, 361–66 (4th Cir. 2006) (holding that juror's request for bailiff to bring Bible into jury room was not an external influence raising Sixth Amendment concerns because bailiff did not "instruct[] the jury to consult the Bible" or do "anything other than simply provide the Bible upon the juror's request"); *Stockton v. Com. Of Va.*, 852 F.2d 740, 744 (4th Cir. 1988) (distinguishing between internal "juror impairment or predisposition" and the more serious danger of "extraneous communication"). Because Barnes credibly alleged an improper *external* influence on the jury, we held, the MAR Court erred in failing to apply a presumption of prejudice and afford Barnes a hearing. *Barnes I*, 751 F.3d at 247–48. However, because habeas relief is only warranted if the petitioner suffered actual prejudice as a result of the constitutional error, we remanded the case for the district court to conduct an evidentiary hearing "solely on the issue of whether the state court's failure to apply the *Remmer* presumption and failure to investigate Juror Jordan's contact with Pastor Lomax had a substantial and injurious effect or influence on the jury's verdict." *Id.* at 252.

On remand, the parties held an evidentiary hearing before a magistrate judge. Barnes called four witnesses: Janine Fodor, Hollie Jordan, Ardith Peacock, and Leah Weddington. The State called no witnesses.

During the evidentiary hearing, the parties raised several objections to certain testimony regarding the jurors' mental thought processes under Federal Rule of Evidence

6

606. The magistrate judge acknowledged that there were "gray areas," or confusion, as to how Rule 606 should apply to the hearing and allowed the State to maintain a standing objection. J.A. 2260. Even with this standing objection, however, the State made several Rule 606 objections throughout the hearing and engaged in extended colloquy with the magistrate judge on how to resolve the issue. *See, e.g.*, J.A. 2283–90. The magistrate judge did not exclude any testimony during the hearing, itself, but gave the parties an opportunity to further address the issue in their post-hearing briefing.

Barnes' first witness, attorney Janine Fodor, represented Barnes in his direct appeal. Fodor testified that while reviewing the trial record, she flagged Barnes' juror misconduct claim as an issue to raise on direct appeal. She then conducted interviews of some members of the jury and "asked about whether or not anybody remembered a juror contacting somebody or bringing a Bible into the jury room." J.A. 2255. Fodor testified that she interviewed Juror Jordan, who confirmed that she had contacted her pastor during sentencing deliberations and shared his thoughts with the jury.

Barnes next called Hollie Jordan. Juror Jordan testified that when she was a juror for Barnes' capital murder trial, she attended Old Country Baptist Church where Tom Lomax was the pastor. She testified that she attended church "[e]very time the doors were open" and considered Pastor Lomax a spiritual guide. J.A. 2267–68. According to Juror Jordan, the closing arguments of Chambers' attorney "stood out" to her because he stated that "if [defendants] got the death sentence that [the jurors] would burn in hell." J.A. 2269. Juror Jordan testified that she "didn't know the Bible all that well then" and sought further counsel from Pastor Lomax on the first night of jury deliberations, before the jury had

7

reached a sentence. J.A. 2269. Juror Jordan said she spoke with Pastor Lomax for "a couple hours probably," but only discussed the case with him for a "few minutes." J.A. 2270–71. She told him "how horrific the pictures [of the crime scene] were," J.A. 2270, and "asked him if we gave [defendants] the death sentence would we burn in hell." J.A. 2269. Pastor Lomax answered no and told her the jurors "had to live by the laws of the land." J.A. 2271. Juror Jordan testified that Pastor Lomax pointed her to "some scriptures in the Bible . . . that explained everything." J.A. 2271. She testified that although she "was worried" that the jurors were "going to die because [they were] killing [the defendants]," she felt better after speaking with Pastor Lomax. J.A. 2272. Juror Jordan testified that she returned to the jury room the following day and spoke with her fellow jurors for 15 to 30 minutes about her conversation with Pastor Lomax.

In response to a question posed by Barnes' counsel, Juror Jordan also noted that when she spoke with Pastor Lomax, she had already "made up in [her] mind" on the sentence she was going to vote for; she "just wanted to know if [she] was going to burn in hell for it." J.A. 2272. Barnes moved to strike this statement under Federal Rule of Evidence 606. In its report and recommendation, the magistrate judge agreed with Barnes that the "juror's mental thought processes should not be considered" and did not consider this response. J.A. 2390. The district court likewise did not consider the statement.

Barnes next called Ardith Peacock (hereinafter "Juror Peacock"), another juror in Barnes' trial. Juror Peacock testified that on the second day of sentencing deliberations, Juror Jordan brought a Bible into the jury room and read several passages aloud. While she did not recall the specific passages that Juror Jordan read, she remembered that one

8

dealt with an "eye for an eye and tooth for a tooth." J.A. 2281. Juror Peacock testified that Juror Jordan did not say, specifically, whether the verses were intended to advocate for or against the death penalty. But she agreed with Barnes' counsel's statement that Juror Jordan brought the passages to the jury's attention in order to rebut the religious statements made during the sentencing phase of trial.

Barnes next called Leah Weddington (hereinafter "Juror Weddington"), another juror at Barnes' trial. Juror Weddington testified that she recalled a female juror reading passages from a Bible in the jury room but did not recall the name of the juror or the specific passages that were read. When asked what may have prompted the juror to read the verses in the jury room, Juror Weddington responded "I guess she was trying to convince someone to—it was okay to give him the death penalty." J.A. 2295.

Following the evidentiary hearing, the magistrate judge issued a report and recommendation concluding that juror misconduct did not have a substantial and injurious effect on the outcome of Barnes' case. With regard to the Rule 606 issue, as noted, the magistrate judge excluded Juror Jordan's testimony that she would have voted to impose the death penalty regardless of Pastor Lomax's advice. However, the magistrate judge also noted that the State "did not address [its Rule 606 objections] with any additional authority or specificity" in its post-hearing briefing and the testimony to which the State objected "appear[ed] to fall within the exceptions in Fed. R. Evid. 606(b)(2)(A) and (B)." J.A. 2390. The magistrate judge therefore overruled the State's Rule 606 objections. The district court held that the magistrate judge did not err in these evidentiary rulings.

In concluding that Barnes had not shown actual prejudice, the magistrate judge reasoned that there was no evidence Pastor Lomax had expressed his views on the death penalty or attempted to persuade Juror Jordan to vote for or against it. The magistrate judge reasoned that evidence did not indicate that Juror Jordan explicitly told the other jurors whether the passages she read were for or against imposing the death penalty. J.A. 2397 ("[T]he passages were related to Pastor Lomax's limited statement to Juror Jordan that the jurors would not 'burn in hell' and that they should follow the law."). Moreover, the magistrate judge noted, aggravating factors against Barnes likely factored more heavily into the jury's decision than Juror Jordan's communication with Pastor Lomax. The district court once again adopted the magistrate judge's report and recommendation and denied habeas relief. Barnes again appeals to this Court.

## II.

We review the district court's denial of Barnes' habeas petition de novo. *See Bauberger v. Haynes*, 632 F.3d 100, 103 (4th Cir. 2011).

## III.

### A.

We concluded in *Barnes I* that the MAR Court's failure to properly apply the *Remmer* presumption and allow Barnes a hearing "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Barnes I*, 751 F.3d at 238 (quoting 28 U.S.C. § 2254(d)(1)). However, "we are

10

not permitted to grant habeas relief unless we are convinced that the error had a substantial and injurious effect"—otherwise known as actual prejudice—on the jury's sentence recommendation.[2]  *See Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002) (internal quotation marks omitted).  "[A] state court's failure to apply the [*Remmer*] presumption only results in actual prejudice if the jury's verdict was tainted" by the external communication.  *Barnes I*, 751 F.3d at 253 (quoting *Hall v. Zenk*, 692 F.3d 793, 805 (7th Cir. 2012)).  Therefore, while the constitutional error in this case lies with the MAR Court's failure to properly apply *Remmer*, in assessing actual prejudice, we look to the effect of Juror Jordan's external communication on the jury's sentencing decision.

The substantial and injurious effect standard used to determine harmlessness on habeas appeal comes from the Supreme Court's decision in *Kotteakos v. United States,* 328 U.S. 750 (1946).[3]  That case instructs us to look to "what effect the error had or reasonably may be taken to have had upon the jury's decision."  *Id.* at 764.  "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand."  *Id.*  However, "[i]f the federal court is 'in grave doubt' about whether the trial error had a 'substantial and injurious effect or

---

[2] As we noted in *Barnes I*, petitioners are not entitled to the *Remmer* presumption of prejudice when proving a substantial and injurious effect on habeas appeal.  *See Lawson* 677 F.3d 629, 644 (4th Cir. 2012) (citing *Vigil v. Zavaras*, 298 F.3d 935, 941 n.6 (10th Cir. 2002)).

[3] The *Kotteakos* standard is a "less onerous harmless-error standard" than the requirement on direct appeal that an error be proven "harmless beyond a reasonable doubt." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (holding that the *Kotteakos* standard applies to harmless error review on habeas appeal).

influence' on the verdict and therefore finds itself 'in virtual equipoise' about the issue, the error is not harmless." *Lawlor v. Zook*, 909 F.3d 614, 634 (4th Cir. 2018) (holding that state court's failure to admit mitigating evidence regarding defendant's ability to adjust to prison was not harmless when the jury expressed confusion over whether and how it could consider such evidence).

## B.

After reviewing the record, which now includes the evidentiary hearing to which Barnes was legally entitled, we hold that Juror Jordan's external communication was not harmless. Accordingly, we reverse and remand the district court's denial of habeas relief.

We note at the outset that our inquiry into whether Barnes has met his burden of showing actual prejudice under the *Kotteakos* standard is frustrated to some extent by the application of Federal Rule of Evidence 606 in this context. That rule provides that a juror may not testify about "any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1). While, under an exception to the rule, a juror may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention" or any "outside influence was improperly brought to bear upon any juror," Fed. R. Evid. 606(b)(2), "juror testimony concerning the *effect* of the outside communication on the minds of jurors is inadmissible," *Stockton v. Com. Of Va.*, 852 F.2d 740, 744 (4th Cir. 1988) (emphasis added).

Rule 606 thus presents unique difficulties in the context of juror misconduct claims. *See Stockton*, 852 F.2d at 750 (Widener, J., concurring in part and dissenting in part) ("To

12

hold, as we do, that any extraneous communication to a juror is presumably prejudicial unless innocuous, and then prevent the State from proving lack of prejudice by the very juror involved, very nearly places the State in a box from which escape is difficult if not impossible."); *Sherman v. Smith*, 89 F.3d 1134, 1144 (4th Cir. 1996) (Murnaghan, J., dissenting) (noting that because of a "sparse inquiry into [a juror's misconduct] at a post-trial hearing" due to Rule 606, "we do not have all of the facts concerning the juror's" misconduct). For example, Barnes was tasked with proving that Juror Jordan's conduct affected the jury's decision, but he was prohibited from directly asking any of the jurors about this effect. This paradox led to confusion during the evidentiary hearing and lengthy colloquies between the parties and the magistrate judge as to the propriety of certain lines of questioning. Meanwhile, the State argues that the district court erred in using Rule 606 to exclude Juror Jordan's testimony stating that she already decided to vote for the death penalty before consulting with Pastor Lomax.

Given how Rule 606 limits the presentation of evidence in these circumstances, it is especially important for us to view the record practically and holistically when considering the effect that a juror's misconduct "reasonably may be taken to have had upon the jury's decision." *Kotteakos*, 328 U.S. at 764. Doing so in this case leaves us with "'grave doubt' about whether the trial error had a 'substantial and injurious effect or influence' on the [sentence]." *Lawlor*, 909 F.3d at 634.

Juror Jordan, a devoutly religious individual, was struck by an attorney's assertion that she would go to hell if she voted to impose the death penalty. She approached her pastor and spiritual guide in the middle of jury deliberations to obtain clarity on that very

13

subject, and he assured her that, contrary to the attorney's arguments, her religious beliefs permitted her to vote for the death penalty. Aware that other jurors had been troubled by the attorney's remarks, she then spent up to 30 minutes discussing her pastor's counsel with the entire jury and reading several Bible verses that he had suggested out loud. Other members of the jury testified that Juror Jordan shared the biblical passages to rebut the attorney's religious statements and "convince someone . . . it was ok" to impose the death penalty.[4] J.A. 2295. While Rule 606 deprives us the benefit of "smoking gun" testimony,[5] the natural ramifications of this series of events are apparent. *Kotteakos* does not require us to ignore them.[6]

---

[4] The dissent argues that Juror Weddington's statement that she "guess[ed] [Juror Jordan] was trying to convince someone . . . it was okay to give him the death penalty," J.A. 2295, is speculative and therefore useless to our analysis. But we do not think that the word "guess" voids Juror Weddington's testimony of any value, especially when her testimony aligns with other evidence indicating that Juror Jordan relayed Pastor Lomax's message to the jury in order to refute the religious statements made during closing arguments. Juror Peacock agreed that it would "be fair to say that [Juror Jordan] brought the Bible passages in to rebut Chambers' attorney's argument." J.A. 2292. And the 1995 interview of Juror Jordan conducted by Barnes' direct appeal team indicated that Juror Jordan sought Pastor Lomax's counsel and relayed it to the jury after noticing that another juror was visibly upset by the closing arguments. Because Barnes' evidentiary hearing came more than 20 years after he requested and was entitled to it, we are left to grapple with decades-old recollections of only a few jurors. We do not rely on Juror Weddington's testimony as isolated evidence of prejudicial effect, but as part of a larger and necessarily circumstantial body of evidence that speaks to the substance of Juror Jordan's communication and its effect on the jury.

[5] *See, e.g.*, *Fullwood*, 290 F.3d at 679–80 (holding that under Rule 606, habeas petitioner could not rely on an affidavit stating that external influence caused a juror to vote for the death penalty).

[6] In analyzing the effects that a private conversation reasonably may be taken to have had on the jury's sentencing decision, we are mindful of the profound distrust with (Continued)

14

The State urges us to consider Juror Jordan's testimony that she had already decided to vote for the death penalty before consulting with Pastor Lomax and only consulted him to determine whether she would "burn in hell" for that decision. J.A. 2272. Because this testimony was elicited by Barnes' attorney, the State argues the testimony is admissible under the "invited error" doctrine. But even if we were to accept the State's argument, our conclusion would not change. Juror Jordan shared Pastor Lomax's counsel with the other jurors in an apparent effort to "convince someone . . . it was ok" to vote for the death penalty. J.A. 2295. And taking Juror Jordan at her word that she had already made up her mind, her testimony necessarily indicates that the only reason to bring Pastor Lomax's views into the jury room was to convince the other jurors to impose the death penalty. In other words, Juror Jordan's state of mind is not, alone, dispositive, and we may nonetheless reasonably conclude that Pastor Lomax's external influence affected the jury's decision.

Our dissenting colleague argues that Pastor Lomax's communication with Juror Jordan was neutral as to the death penalty and had no bearing on the jury's ultimate decision. Evidence does not indicate, the dissent argues, that the pastor provided a direct

which courts regard an extraneous influence on any juror. *See, e.g., Turner v. Louisiana,* 379 U.S. 466, 473–74 (1965) (concluding that defendant suffered prejudice from officers' association with jurors in their charge during a case for which the officers were key prosecution witnesses and their testimony conflicted with that of the accused); *Parker v. Gladden,* 385 U.S. 363, 363–65 (1966) (concluding that bailiff's comment to two jurors that the "wicked fellow (petitioner), he is guilty" and that "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it" was not harmless); *Fullwood*, 290 F.3d at 681 (noting that, if true, defendant's allegations of juror misconduct may constitute actual prejudice when juror's spouse pressured her throughout the trial to impose the death penalty). This distrust is only amplified when, as in this case, extraneous information is offered to the *entire* jury.

15

recommendation as to Barnes' sentence or otherwise "expanded the circumstances in which the jury could lawfully impose the death penalty." But a prejudicial influence need not take the form of a third party directly telling jurors how they should vote or introducing new facts or law for their consideration. *See, e.g., Turner v. Louisiana,* 379 U.S. 466, 473–74 (1965) (holding that key prosecution witnesses' association with jurors throughout trial was prejudicial even though witnesses did not discuss details of the case with jurors). An improper external influence may include "an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering . . . with a juror.'" *Robinson*, 438 F.3d at 363 (citing *Remmer*, 347 U.S. at 229). Pastor Lomax's thoughts on whether the Bible condones the death penalty—when, in urging jurors to vote against that punishment, an attorney had just insisted that it does not—constitutes an outside influence on the jury's partiality.

It is also somewhat specious to suggest that the message conveyed to the jury was neutral. Viewing the evidence in context, we may readily discern the thrust and objective of Pastor Lomax's conversation with Juror Jordan, and hers with the rest of the jury. Pastor Lomax's instruction that jurors would not go to hell if they "live[d] by the laws of the land," J.A. 2271, served to contradict the statements made by Chambers' attorney that while North Carolina law allowed jurors to impose the death penalty, God's law did not. It is reasonable to conclude that, especially coming from a figure of religious authority, Pastor Lomax's message assuaged reservations about imposing the death penalty that the attorney's comments may have instilled. Further, the length of Juror Jordan's conversation

16

with the jury—up to 30 minutes in less than two full days of deliberation—counsels against concluding that the discussion had no effect on the jury's decision.

Finally, we are not convinced that the strength of the State's case against Barnes precludes us from holding that Barnes has shown actual prejudice. The focus of the harmless error inquiry is "not on the sufficiency of the evidence absent the error, but rather on the impact of the error on the jury's verdict." *Sherman*, 89 F.3d at 1155 (Motz, J., concurring in part and dissenting in part); *see also Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) ("Harmless error review looks . . . to the basis on which the jury *actually* rested its verdict . . . not [to] whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered.").

While the harmless error standard on habeas review is stringent, it does not require virtual certainty to grant relief. The testimony presented at the evidentiary hearing was sufficient to leave us "in virtual equipoise" as to whether the error had a substantial and injurious effect on the jury's decision. *Lawlor*, 909 F.3d at 634.

IV.

At this stage in the proceedings, Barnes has met his evidentiary burdens as to both constitutional error and actual prejudice. Therefore, we REVERSE the district court's denial of habeas relief and REMAND for further proceedings consistent with this opinion.

AGEE, Circuit Judge, dissenting:

To obtain relief under 28 U.S.C. § 2254, a state prisoner must demonstrate actual prejudice. Barnes asserts that he has satisfied his burden by showing: (1) after a co-defendants' counsel argued the jurors would go to hell if they imposed the death penalty, a juror asked her pastor whether the Bible did indeed direct that course if they decided to impose the death penalty; (2) the pastor responded "no" and provided her with Bible verses supporting the view that Christians are called to follow the law of the land; and (3) the juror shared her pastor's response and the Bible verses with her fellow jurors during deliberations. The majority agrees with Barnes and grants him habeas relief based on its conclusion that this external communication may have "assuaged reservations about imposing the death penalty that the attorney's comments may have instilled" and thus actually prejudiced Barnes' sentencing. Maj. Op. 16. Because the record does not support the majority's conclusion that the external communication actually prejudiced Barnes, I respectfully dissent.

I.

In 1992, Barnes and two other men robbed and killed B.P. and Ruby Tutterow. In a joint jury trial held in North Carolina state court, all three men were convicted on two counts of first-degree murder, two counts of robbery with a dangerous weapon, and one count of first-degree burglary.

18

During closing arguments in the penalty phase of the trial, counsel for one of Barnes' co-defendants urged the jury not to impose the death penalty because although state law permitted it, God's law prohibited that penalty. Counsel argued that if the jurors were "true believer[s]," they knew that one day God would hold them accountable for their actions just as He would hold the defendants responsible. J.A. 2374. Counsel admonished the jurors that they would want God to say "Well done, my good and faithful servant. You have done good things with your life. You have done good deeds. Enter into the Kingdom of Heaven," and that they would not want to have to justify their decision to violate his commandment not to kill "because the laws of man said I could." J.A. 2374.[1]

Following deliberation, the jury recommended the death penalty for Barnes and one co-defendant—both of whom were identified by the third co-defendant as the individuals who shot the Tutterows—and mandatory life imprisonment for the third co-defendant. The trial court imposed the recommended sentences.

Just after the jury announced their sentencing decision, Barnes' counsel informed the court that he had discovered that one of the jurors spoke to a member of the clergy "about a particular question as to the death penalty." J.A. 1602. After counsel confirmed that he had no evidence that the juror discussed "the particular facts of this case with anybody outside the jury," the trial court judge denied counsel's request to question the jury about deliberations. J.A. 1602–03.

---

[1] For reasons not apparent in the record, the prosecution did not object to counsel's manipulation of the jury's religious beliefs and the trial court gave no cautionary or limiting instruction.

Barnes argued on both direct appeal and in his state motion for appropriate relief that it was error for the trial court not to investigate whether the sentencing deliberations had been prejudiced by juror contact with a third party. His claims were rejected at both stages. *State v. Barnes*, 481 S.E.2d 44, 68 (N.C. 1997); J.A. 1882–83 (MAR court's denial).

After exhausting his state remedies, Barnes filed a petition under 28 U.S.C. § 2254 arguing that the state court's adjudication of his juror misconduct claim was contrary to or unreasonably applied *Remmer v. United States*, 347 U.S. 227 (1954), which held that "any private communication, contact, or tampering . . . with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial" and warranted an evidentiary hearing on that issue. *Id.* at 229. The district court disagreed and denied relief, *Barnes v. Lassiter*, No. 1:08–cv–00271, 2013 WL 1314466 (M.D.N.C. Mar. 28, 2013), but on appeal a majority of this Court agreed with Barnes that the state court misapplied *Remmer*. *Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014). As a consequence, the case was remanded to the district court for a determination of whether actual prejudice resulted from the juror's third-party communication.

However, having concluded that Barnes was not entitled to relief under the highly deferential standard of review federal courts apply under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), I dissented from the majority's decision. *Id.* at 253 (Agee, J., dissenting). That dissenting opinion explains why "'fairminded jurists could disagree' as to whether the communication Barnes alleges to have occurred constituted juror contact with a third party 'about a matter pending before the jury'" given that it "did

20

not directly bear upon how the juror would vote" in this case. *Id.* at 266 (Agee, J., dissenting).[2]

On remand, the district court referred the case to a magistrate judge to conduct the evidentiary hearing. Barnes called three members of the jury as witnesses: the juror who spoke with her pastor (Hollie Jordan) and two jurors who recounted aspects of the jury deliberations (Ardith Peacock and Leah Weddington).[3] In sum, Juror Jordan testified that she approached her pastor because she was concerned about the co-defendants' closing argument that the jurors "would burn in hell" if they imposed the death sentence. J.A. 2269. Jordan testified that her pastor said the Bible taught that "we had to live by the laws of the land" and "told [her] some scriptures in the Bible" to support that view, though she could not recall which verses he used. J.A. 2271. Juror Peacock also recalled that Jordan brought a Bible into deliberations and read "several passages" from it, adding that she believed one verse had to do with "the eye for an eye and tooth for a tooth," but she was not sure what

---

[2] The State petitioned for certiorari in the Supreme Court of the United States. The Supreme Court denied certiorari, though Justice Thomas wrote an opinion dissenting from the denial, which Justice Alito joined. *Joyner v. Barnes*, 135 S. Ct. 2643 (2015) (mem.). According to Justice Thomas, the state court did not unreasonably apply Supreme Court precedent in concluding that a question posed by a juror to her minister "about the death penalty generally [] did not discuss the facts of the case" and "did not concern the matter pending before the jury" for purposes of applying *Remmer*. *Id.* at 2647.

[3] Barnes also called as a witness his counsel from the direct appeal, though as the magistrate judge noted in her report and recommendation, the attorney testified less as a fact witness than as an additional attorney's assessment of potential issues for appeal. Neither party relies on her testimony.

The record also shows that Jordan's pastor, Tom Lomax, had died prior to the district court proceedings.

21

verses or books of the Bible were read. J.A. 2281, 2292. Peacock testified that Jordan "did not state that [the verses she read] were for" or against the death penalty. J.A. 2290, 2292. Instead, she characterized Jordan's statements as flowing from "the closing argument . . . that one of the defense attorneys had" given. J.A. 2290. According to Peacock, Jordan read the Bible verses to "say[], you know, we are doing our duty" as a rebuttal to the defense attorney's contention that the Bible said they would go to hell should they sentence the defendants to death. J.A. 2291–92. Juror Weddington remembered a female juror reading from the Bible during deliberations, though she, too, could not recall which verses were read. Nor did Weddington testify to the context for the Bible reading. When asked "what might have prompted the juror . . . to bring the Bible into the jury room," Weddington replied, "I guess she was trying to convince someone to – it was okay to give [the defendants] the death penalty." J.A. 2295.

The magistrate judge's report and recommendation concluded Barnes' petition should be denied, finding any error was harmless "because there was no actual prejudice to [Barnes] since the jury verdict in this case was not tainted by the third-party contact between Juror Jordan and" her pastor. J.A. 2395. In particular, the magistrate noted that the evidence did not show that the juror's conversation with her pastor touched on the appropriate punishment for any defendant in this case, but rather centered on whether the Bible would *ever* allow a devout juror to impose the death penalty. The magistrate judge also pointed to the nature of Barnes' crimes and the jury's decision to sentence two defendants to death and one to life imprisonment as confirmation that the verdicts were

22

based on the proper statutory facts before the jury rather than an improper external influence.

The district court adopted the magistrate judge's report and recommendation with only minor modifications, and it denied Barnes' petition. *Barnes v. Thomas*, No. 1:08cv271, 2018 WL 3659016 (M.D.N.C. Aug. 2, 2018). The district court characterized as "speculation" Juror Weddington's testimony that she "guess[ed]" Jordan's motive for reading the Bible during deliberations was to advocate for the death penalty. *Id.* at *6. It pointed to the record evidence about the nature of Jordan's conversation with her pastor and the information shared with other jurors to support the conclusion that neither the pastor nor Jordan advocated for one sentence over another, noting that the pastor's admonitions to follow the law of the land were precisely what the trial court instructed the jurors to do. And the district court recounted the strength of the state's case against Barnes as further evidence of harmlessness. Despite the court's confidence in its conclusion, given that the case involved the death penalty, it granted Barnes a certificate of appealability "on the issue of whether the extraneous communication between Juror Jordan and [her pastor] had a 'substantial and injurious effect or influence in determining the jury's verdict,' or rather was harmless." *Id.* at *11.

## II.

To be eligible for relief, Barnes must satisfy AEDPA's strict limits on when a federal court can grant relief to state prisoners. First, he must exhaust his state court remedies before being able to raise a claim in federal court. 28 U.S.C. § 2254(b)(1).

23

Second, he must show that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). And third, because "most constitutional errors can be harmless," *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991), he must demonstrate that the error complained of caused actual prejudice. *Fullwood v. Lee*, 290 F.3d 663, 679 (4th Cir. 2002).

For the detailed reasons set out in my previous dissenting opinion, I continue to adhere to the view that Barnes'§ 2254 petition should be denied because it fails at the second stage of inquiry: the state court's adjudication of his juror misconduct claim did not involve an unreasonable application of *Remmer*. *Barnes*, 751 F.3d at 253–66 (Agee, J., dissenting). But the panel majority has held otherwise, and this appeal centers on whether Barnes has cleared the third hurdle to obtaining habeas relief by showing that the error was not harmless: that is, that he suffered actual prejudice.

In the context of § 2254 proceedings, we apply the harmless error standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which differs from the way harmlessness is analyzed in review upon direct appeal. "Because of the threat collateral attacks pose to finality, comity and federalism, habeas petitions may secure the writ only if the error actually prejudiced them." *Bauberger v. Haynes*, 632 F.3d 100, 104 (4th Cir. 2011).[4] In this context, "actual prejudice" means showing that the error "had a substantial and

---

[4] Here, and throughout the opinion, I have omitted internal quotation marks, alterations, citations unless otherwise noted.

24

injurious effect or influence in determining the jury's verdict." *Fullwood*, 290 F.3d at 679 (quoting *Brecht*, 507 U.S. at 637). In an "unusual" case, the question of whether a substantial or injurious effect or influence may be "so evenly balanced" that the Court is in "grave doubt" as to the harmlessness of an error; in that case, the Court should grant the § 2254 petition. *Bauberger*, 632 F.3d at 104. But in the ordinary case, the Court can assess the error and determine whether the defendant has demonstrated actual prejudice. *See id.* In the context of errors that occur during the sentencing phase of a death penalty case, the question before the Court is whether the error had a "substantial and injurious effect or influence on the jury's decision to sentence [the defendant] to death." *See Tuggle v. Netherland*, 79 F.3d 1386, 1393 (4th Cir. 1996).

The evidence Barnes developed in the district court does not demonstrate actual prejudice for at least three reasons: (1) the third-party communication was neutral concerning how Barnes should be sentenced; (2) the communication did not alter the facts or the law that the jury was instructed to use in deciding how to sentence Barnes; and (3) the communication does not bear any other hallmarks of having had a substantial or injurious effect or influence on the deliberative process.

## A.

Barnes first fails to demonstrate actual prejudice because the external communication that occurred in this case did not relate to what sentence the jury should impose for Barnes' crimes. Put another way, the nature of the communication was of such a neutral and tangential nature to the issue before the jury that it could not have had an "injurious effect or influence" on the jury's sentencing decision. *Brecht*, 507 U.S. at 627.

25

The Supreme Court has recognized that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). This means that when assessing instances of improper jury communication with a third-party, the Court must ensure that the defendant was tried by a "jury capable and willing to decide the case solely on the evidence before it." *Id.*; *see also Rushen v. Spain*, 464 U.S. 114, 118–120 (1983). Consequently, not every improper communication between a juror and non-juror is actually prejudicial to a defendant. Sometimes, the nature of the conversation will readily reveal whether it was innocuous— e.g., a salutation—or injurious—e.g., opinion about guilt.

Based on this understanding, courts have recognized that a petitioner may be able to satisfy his burden of showing actual prejudice when one or more jurors is exposed to a non-juror's opinion about the defendant's guilt or punishment. Indeed, the Supreme Court has stated that "it would be blinking reality not to recognize the extreme prejudice inherent" when a court employee offers his opinion about the defendant's culpability to the jurors. *Parker v. Gladden*, 385 U.S. 363, 365 (1966) (per curiam). Specifically, in *Parker*, a bailiff assigned to a jury told several jurors, "Oh that wicked fellow (petitioner), he is guilty" and later said to another juror that "[i]f there is anything wrong (in finding petitioner guilty) the Supreme Court will correct it." *Id.* at 363–64 . Along this line, the U.S. Court of Appeals for the Ninth Circuit has recognized that although "not every incident of a juror's ex parte contact with friends or relatives would constitute actual prejudice to a defendant," a habeas petitioner had demonstrated actual prejudice when a juror engaged in "active[] discuss[ions]" about the case with her friends and those friends "presented . . . strong

26

opinions concerning the proper outcome of [the defendant's case]." *United States v. Maree*, 934 F.2d 196, 202 (9th Cir. 1991) *abrogated on other grounds by United States v. Adams*, 432 F.3d 1092 (9th Cir. 2006).

In contrast to the bailiff in *Parker* and the juror's friends in *Maree*, the record developed in the district court here is unequivocal that Juror Jordan's pastor did not provide his opinion regarding an appropriate sentence for Barnes or comment on any of the evidence or law relevant to the jury's deliberations. This was so because Jordan did not ask her pastor's "advice or counsel about the case" and only asked him about "the closing argument as far as . . . if they got the death sentence for what they did and we sentenced them to death, were we going to die because we're killing them." J.A. 2272. She solicited her pastor's view on the narrow issue of whether the Bible said jurors could go to hell if they decided to sentence the defendants to death. Jordan repeatedly stated, without contradiction, that she did not seek her pastor's advice about the case or how she should vote. J.A. 2275–76 ("The only thing [that led me to talk to him] was as far as burning in hell. That's the only reason I went and talked to him."). There is no record evidence to the contrary.

The pastor's response was similarly limited: that jurors would not be condemned to hell for their sentencing decision because the Bible did not teach that view. Instead, the pastor noted the Bible instructed Christians to "live by the laws of the land." J.A. 2273. Pastor Lomax provided Jordan with a few Bible verses to support that view. Most importantly, at no time did the pastor lead Jordan to believe "the Bible supported [or] didn't support the death penalty," or give his view in any way as to the disposition of Barnes'

27

case. J.A. 2273. Jordan relayed the same information to other jurors at the next day's deliberations.

Juror Peacock's testimony wholly supports Jordan's testimony on this point, reiterating that Jordan did not use the pastor's comments or the Bible verses to support or oppose the death penalty for Barnes or any of the other defendants.[5]

Juror Weddington's testimony does not alter this analysis. Her recollections were hazy and not well-developed, as she testified only that a female juror had read from the Bible during deliberations and did not provide any testimony connecting the juror's comments to a conversation with her pastor. When asked what might have prompted the juror to read from the Bible, Weddington speculated, "I *guess* she was trying to convince someone to – it was okay to give him the death penalty." J.A. 2295 (emphasis added). But guesses are not evidence. *The Mattano*, 52 F. 876, 880 (4th Cir. 1892) ("[L]oose conjecture is not testimony."); *see also U.S. Steel Min. Co. v. Director, Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 187 F.3d 384, 390 (4th Cir. 1999) (noting the words used in the testimony—"it is *possible* that it *could*"—rendered the testimony "entirely speculative").

---

[5] Given that none of the witnesses could recall where in the Bible the verses originated, Peacock's recollection that one verse had to do with an "eye for an eye and tooth for a tooth" is of limited evidentiary value. J.A. 2281. The phrase appears in both the Old and New Testaments, and in the New Testament appearance the phrase is followed by the admonition "But I say unto you, That ye resist not evil: but whosoever shall smite thee on they right cheek, turn to him the other also." Matthew 5:38–39; *see Hurst v. Joyner*, 757 F.3d 389, 392 n.1 (4th Cir. 2014) (discussing the four appearances of the phrase in the Christian Bible); *Robinson v. Polk*, 438 F.3d 350, 358 n.8 (4th Cir. 2006) (same).

Unable to recall details of Jordan's communication, Weddington provided no factual information about Jordan's statements during the deliberations that would allow for a factfinder to conclude that her "guess" was based on any reasonable impression formed from witnessing the events in question. Specifically, Weddington did not identify which female juror read from the Bible, what Bible verses were read, or whether they were from the Old or New Testament, and she did not provide any testimony regarding what else the juror said besides reading from the Bible. Juror Weddington thus offered no basis for connecting her "guess" about the juror's motive to what the juror did. At bottom, Weddington acknowledged she was "guess[ing]" at a reason and the district court properly took her at her word when it concluded Weddington's statement was speculative and thus not evidence of actual prejudice. J.A. 2443-45. The majority errs in relying on her conjecture as a basis for granting Barnes relief.

Further, the majority opinion simply ignores the uncontested fact that no witness—none—testified that Pastor Lomax said anything that attempted to influence Juror Jordan (directly) or another juror (indirectly) as to the merits of what sentence Barnes should receive under North Carolina law. Unlike the bailiff's express opinion of guilt in *Parker* or the friends' open discussion of the case in *Maree*, the external communication that occurred in this case did not address the merits of the case nor did it expose Juror Jordan or any other juror to a third-party's view of the evidence or the appropriate sentence. While an inappropriate third-party communication occurred, it was unrelated to the question of what sentence Barnes should receive and thus could not have prejudiced him by affecting or influencing the jury's decision making.

29

Courts have held that when a communication, as that here, is innocuous or not about the decision the jury must make, the error has not actually prejudiced the defendant even when the communication was tangentially related to the case. *E.g.*, *Rushen*, 464 U.S. at 118–19 (concluding no prejudice arose from juror's ex parte communication with trial judge concerning juror's personal acquaintance with a prior victim of the defendant because judge had ensured juror could still be impartial during deliberations); *Crease v. McKune*, 189 F.3d 1188, 1190, 1192–94 (10th Cir. 1999) (holding petitioner had not demonstrated actual prejudice when a juror had an ex parte conversation with the judge during which she expressed discomfort with state law and the judge reiterated several jury instructions and "admonished her according to the jury instructions that she cannot allow prejudice and sympathy to enter into her deliberation" because the judge did not pressure her to vote to convict or suggest how she should vote); *United States v. Endicott*, 869 F.2d 452, 454, 457 (9th Cir. 1989) (concluding that no actual prejudice resulted from contact between a juror and a government witness where the juror complained to the witness that the defendants were "guilty," but "we will have to listen to all the rest of the b.s." because the exchange was "inconsequential"); *United States v. Day*, 830 F.2d 1099, 1103–07 (10th Cir. 1987) (holding no actual prejudice where a juror and a government witness engaged in "a casual, time-of-the-day greeting" about how the juror was "holding up" and that the testimony "may put you to sleep"); *see also United States v. Davis*, 51 F.3d 269, 1995 WL 139323, *3 (4th Cir. 1995) (unpublished table decision) (holding defendant failed to demonstrate actual prejudice when a juror asked the government's case agent what the

30

Bureau of Alcohol, Tobacco, and Firearms did because "the conversation had not involved the merits of the pending case").

As in the cases cited above, Barnes has failed to demonstrate that the conversation between Juror Jordan and her pastor, by its nature, had a substantial and injurious effect or influence on his being sentenced to death. The communication involved a topic tangential to the jury's assessment of the law and facts relevant to the sentencing determination. At no point did the pastor communicate his views about Barnes, Barnes' co-defendants, or the case itself. Nor did he even mention the Bible's views of the death penalty generally, or under what circumstances the Bible may allow for such a sentence. Because Jordan's conversation with her pastor did not advocate for or against the death penalty in general— let alone as the appropriate punishment for Barnes—it could not have swayed her own or any other juror's decision about how to sentence Barnes. Thus, as many courts considering similarly tangential ex parte communications have concluded, an innocuous conversation like Jordan's with her pastor could not have not actually prejudiced Barnes.

The majority opinion's contrary conclusion stems from multiple missteps. At the outset, it draws the specious conclusion that the third-party communication advocated for the death penalty: a conclusion wholly without support in the record. That conclusion ignores the entirety of the testimony concerning what the pastor said: first, that jurors would not go to hell *if* they voted to impose the death penalty, and, second, that the Bible said individuals should follow the law of the land. These statements are neutral on the question of how Barnes should be sentenced. What is more, the majority's conclusion contradicts

the testimony of both Juror Jordan and Juror Peacock that the information relayed directly or indirectly from the pastor did not advocate for or against the death penalty.

Given that the pastor's comments could not possibly have been injurious to Barnes, the communication that occurred in this case could not have had a prejudicial effect or influence on the verdict. But after the majority opinion manipulates the communication into a broadly pro-death penalty influence, it then excuses Barnes for failing to prove that aspect of actual prejudice by blaming Federal Rule of Evidence 606. But this rule offers no refuge. Rule 606 codifies the common-law prohibition of admitting juror testimony to impeach a jury verdict. Fed. R. Evid. 606(b)(1) ("During an inquiry into the validity of a verdict or indictment, a juror may not testify about . . . the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."). An exception to that rule found in both the federal and North Carolina rules of evidence allows jurors to testify as to "whether extraneous prejudicial information [that has been] improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Robinson*, 438 F.3d at 360 n.10 (citing Fed. R. Evid. 606(b); N.C. Gen. Stat. § 8C-1, Rule 606(b)). This exception allowed Barnes to garner evidence concerning Juror Jordan's communication with her pastor and her conveyance of that information to the jury.

But Barnes' problem demonstrating actual prejudice did not arise from his inability to present witnesses who could confirm that they were persuaded to vote for the death penalty as a result of Juror Jordan's conversation with her pastor. Rather, Barnes' claim falters because he has an objective failure of proof that the communication exposed Jordan

32

or another juror to a third party's opinion that they should sentence Barnes to death. Unlike the instances where the subject matter of the communication had a clear analytical bridge to the prejudicial effect or influence, the communication in this case touched on a different topic. The majority can only reach a contrary conclusion by misrepresenting what the conversation entailed and then speculating about its unproven influence on a juror. That reasoning falls far short of proof of actual prejudice and is contrary to the record.

B.

Barnes also failed to demonstrate actual prejudice because the external communication did not materially alter the facts or law by which the jurors were to determine Barnes' sentence. As the district court explained,

> [i]n the absence of additional evidence that either Pastor Lomax or Juror Jordan employed Bible verses to actively encourage jurors to impose the death penalty, the logical conclusion is that the extraneous influence encouraged the jurors to decide the case based on the facts presented and the law of North Carolina and not based on the religious constraints defense counsel sought to impose. This weighs against any finding that the extraneous influence had a substantial and injurious effect or influence in determining the jury's verdict.

*Barnes*, 2018 WL 3659016, at \*7.

Conversely, a defendant could establish actual prejudice by showing external influences that alter the facts being considered during deliberations. For example, courts have held that a petitioner may be able to satisfy the *Brecht* standard when the jury considers inculpatory evidence that was not presented at trial. *E.g.*, *Sassounian v. Roe*, 230 F.3d 1097, 1108–12 (9th Cir. 2000) (holding actual prejudice was shown when jury considered a telephone call that had not been discussed during the trial and which related

to the defendant's motive); *Bonner v. Holt*, 26 F.3d 1081, 1084 (11th Cir. 1994) (holding the defendant was actually prejudiced when jury returned a verdict of guilt only after learning that the defendant was a habitual offender, a fact that was not introduced at trial); *Marino v. Vasquez*, 812 F.2d 499, 506 (9th Cir. 1987) (observing that petitioner had established actual prejudice because there was "a direct and rational connection between the extrinsic material" and the jury's verdict when the jury engaged in an "unauthorized out-of-court experiment with [a] gun [that] relate[d] to the defense theory of self-defense, which was a material element"); *cf. Dorsey v. Quarterman*, 494 F.3d 527, 531–32 (5th Cir. 2007) (holding the defendant did not experience actual prejudice when jurors inadvertently received an unedited transcript that contained information about the defendant's prior bad acts because jurors "were questioned to insure that they would disregard the material" and "be impartial" during deliberations and the evidence against the defendant was overwhelming). Of course, there's no evidence in this case—none—that Juror Jordan conversation with her pastor exposed any juror to any new facts that might be relevant to his sentence or shed a different light on the known facts.

Separately, external influences that materially alter the legal standard the jury uses to deliberate may establish actual prejudice. *E.g.*, *Marino*, 813 F.2d at 506 (observing that petitioner established actual prejudice because there was a "direct and rational connection between the extrinsic material" and the jury's verdict when the jury consulted a dictionary definition that changed the meaning of the offense's material element in dispute).

But where the external influence did not materially alter the jury's understanding of the circumstances in which it could reach its verdict, that influence—even when it changed

34

the jury's comprehension of a material legal element—did not rise to the level of being actually prejudicial. In *Bauberger*, we held that the petitioner had not demonstrated actual prejudice for purposes of § 2254 arising from the jurors' decision to review "dictionary definitions of several words in the judge's instructions." 632 F.3d at 102.[6] In relevant part, that jury was tasked with determining whether Bauberger was guilty of second-degree murder and the only disputed element in the case was whether he had acted with "malice." The court instructed the jurors:

> Malice is a necessary element which distinguishes second degree murder from manslaughter. Malice arises when an act which is inherently dangerous to human life is intentionally done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief.

*Id.* at 105. On a lunch break, the jury foreperson obtained a dictionary and, when deliberations resumed, read several of its definitions to other jurors, including the terms "recklessly"—defined as "lack of due caution"—and "wantonly"—defined as "arrogant recklessness of justice or the feelings of others." *Id.* at 105–06. Later that day, the jury convicted Bauberger of second-degree murder. In his § 2254 petition, Bauberger argued that the jury's decision to consult the dictionary during deliberations had a substantial and injurious effect because one or more jurors may have relied on those definitions, which he contended lowered the government's burden of proving malice as defined by the law.

---

[6] Although third-party communications differ from other sorts of external influences on a jury for certain aspects of the analysis, *see United States v. Lawson*, 677 F.3d 629, 644 (4th Cir. 2012), both could demonstrate actual prejudice if they resulted in an alteration to the legal standard by which the jury weighed the evidence.

The Court disagreed, concluding that the definitions of malice "even as possibly modified by the definitions the jurors consulted, fully conveyed the essence of North Carolina law concerning malice." *Id.* at 107. In short, we held that "Bauberger's verdict was not substantially and injuriously affected by the dictionary's definition of 'recklessly' because the altered instruction as a whole remained materially equivalent to the one given by the judge." *Id.* The Court reached the same conclusion regarding the jury's consideration of the term "wantonly," explaining that "[a]ny modification of the instruction that came about by virtue of the dictionary's definition of 'wantonly' did not materially affect that instruction's malice standard." *Id.* Lastly, the Court "look[ed] to the strength of the evidence in assessing whether the dictionary use substantially and injuriously affected Bauberger's verdict," concluding that because the evidence on this element was "not likely a close one," meaning that "it is less likely that the error impacted the jury's decision." *Id.* at 108.

*Bauberger* counsels that the external communication in this case, which related to the jury's decision far less than the unauthorized use of a dictionary in *Bauberger* did, could not have substantially and injuriously affected Barnes' sentence. As discussed, Juror Jordan's pastor relayed two thoughts that Jordan then shared with the jury: that the Bible commanded jurors to follow "the laws of the land" and that the Bible did not say that jurors would go to hell if they decided to impose the death penalty. J.A. 2271. While those positions countered the co-defendants' closing argument, they were fully consistent with the jurors' duty in making their sentencing decision: to sentence Barnes based on North Carolina's capital sentencing criteria, not the Bible's view for or against the death penalty.

36

The external communication that occurred in this case—while inappropriate—neither introduced an improper consideration into the deliberative process nor expanded the circumstances in which the jury could lawfully impose the death penalty.

Simply put, the view that jurors must follow the law of the land—regardless of their personal convictions regarding the morality of the death penalty—corresponds precisely with federal and state law establishing a juror's sworn obligation during deliberations. Jurors in a capital case are charged with determining an appropriate sentence based on the legally relevant factors as applied to the facts of the case. *See, e.g.*, *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). To that end, prospective jurors can be questioned and excused for cause if they hold any views that would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *see also* N.C. Gen. Stat. § 15A-1212(8) (stating that jurors can be challenged for cause on the ground that the juror "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina"); *Robinson*, 444 F.3d at 226 (Wilkinson, J., concurring in denial of rehearing en banc) ("Courts have always recognized that jurors' personal convictions, including religious ones, may impede the dutiful performance of their momentous responsibility."). In addition, North Carolina courts have "repeatedly cautioned counsel that they should base their jury arguments solely upon the secular law and the facts," although various arguments invoking the Bible have been held not to so infect a trial with unfairness as to violate a defendant's due process rights. *State v. Lloyd*, 552 S.E.2d 596, 624–25 (N.C. 2001); *see*

37

*also State v. Williams*, 510 S.E.2d 626, 643 (N.C. 1999) ("Our trial courts must vigilantly ensure that counsel for the State and for defendant do not distract the jury from its sole and exclusive duty to apply secular law.").

Juror Jordan's conversation with her pastor, which she relayed to the other jurors, reinforced the very framework by which the jurors had already been instructed to use when assessing a proper sentence: to rely solely on North Carolina's sentencing criteria.

The same conclusion can be drawn from the comment that the Bible did not say jurors would go to hell if they decided to impose the death penalty. As with the earlier statement, this communication did not expand the circumstances in which the jury could sentence Barnes to death under North Carolina law. Instead, it directed the jurors to follow their obligation to review the relevant factors under North Carolina law and determine whether the circumstances of Barnes' case warranted death or life imprisonment. In sum, the external communication mitigated the argument by Barnes' co-defendant's counsel that the jurors would face eternal damnation, but mitigating that argument did not implicate the jury's duty during deliberations: to determine an appropriate sentence for Barnes based on the facts and North Carolina law.

As was true in *Bauburger*, the external communications that occurred in this case were consistent with "the essence of North Carolina law" concerning the jurors' sentencing options and did not "materially affect[]" that standard. *Bauberger*, 632 F.3d at 107. Because the external communication at issue here did not lead the jury to consider additional facts or incorrect law in making its sentencing determination, the communication did not have an injurious effect or influence on that process. Absent this

38

influence, the admonition to jurors to follow their sworn duty cannot support a finding of actual prejudice.

## C.

Additional factors reinforce the conclusion that Barnes was not actually prejudiced as a result of the external communication between Juror Jordan and her pastor, including: the comparatively short duration of the communication, the jury's split sentencing decision between the three co-defendants, and the jury's specific findings in the penalty phase.

Courts have considered the timing and duration of any error as part of their actual prejudice assessment. *Fitzgerald v. Greene*, 150 F.3d 357, 366 (4th Cir. 1998) (concluding no actual prejudice had resulted from a juror's statement the defendant claimed to demonstrate implied bias because when the statement was made, the jury had already voted to convict the defendant and recommended the death penalty for one charge); *Marino*, 812 F.2d at 506 (noting that the "length of time [extrinsic material] was available to the jury," "the extent to which the [jury] discussed and considered it," and when the material was introduced and "at what point in the deliberations" were all factors to be considered as part of the total actual prejudice assessment). Here, Juror Jordan's conversation with her pastor lasted only a "few minutes" during a substantially longer conversation with him about other matters. J.A. 2271. Then, during deliberations that spanned more than one day, Juror Jordan spent "15 to 30 minutes" discussing the view that Christians were to "live by the laws of the land" and "read[ing] the Bible verses to them" that her pastor had given to her. J.A. 2273–75. All told, there is no evidence that the pastor's comments concerning the Bible's instruction to follow the law of the land took a place of prominence during the deliberative

39

process. Nor is there any indication, as has been present in other cases, that this discussion occurred at a critical juncture—such as between a deadlocked jury and final verdict—in the deliberations. *E.g.*, *Marino*, 812 F.2d at 506; *Bulger v. McClay*, 575 F.2d 407, 411–12 (2d Cir. 1978)(relying in part on the jury's "difficulty in reaching a verdict" before being exposed to extra-record information as the basis for concluding the error "may well have been determinative" to the verdict).

Courts have also looked to the strength or weakness of the prosecution's case when assessing whether an error had a substantial and injurious effect or influence. *Jones v. Angelone*, 94 F.3d 900, 909 n.10 (4th Cir. 1996) (observing that this factor is relevant to determining whether the error was "substantial"); *accord Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006); *Malicoat v. Mullin*, 426 F.3d 1241, 1250–52 (10th Cir. 2005). Given that the decision to impose the death penalty involves a level of subjective assessment that is not present when assessing guilt in the first instance, I recognize that this factor has a limited utility. Nonetheless, when combined with the reasons already discussed and the following aspects of the sentence deliberations, there is no room for any "grave doubt" as to the harmlessness of the external communication that occurred in this case.

First, the jurors returned different sentences for the three co-defendants. As noted, the jury was deliberating the appropriate sentence for Barnes and his two co-defendants at the same time. All three men could have received the death penalty. But the jurors decided that only Barnes and one co-defendant should receive the death penalty, while they sentenced the second co-defendant to life imprisonment. This determination reflects that the jurors understood their duty to individually assess the appropriate punishment for each

40

defendant, as consistent with the jury instructions. Moreover, they imposed the death penalty against the two individuals (including Barnes) who had been identified by a co-defendant as the individuals who actually shot the victims, while imposing a life sentence against the third co-defendant, who had participated in the robbery scheme and was present during the murders. This, too, reflects that the jurors imposed a sentence based on their view of the defendants' relative culpability in the murders as opposed to a Biblical mandate for or against the death penalty.

Second, the jurors returned an individualized assessment of mitigating and aggravating factors for Barnes based on North Carolina's capital sentencing criteria. Part of the jury's deliberations in the penalty phase required them to find specific mitigating and aggravating factors under North Carolina law. They found 10 mitigating factors and 4 aggravating factors relevant to their decision to sentence Barnes to death. As the district court noted, the mitigating factors "related primarily to [Barnes'] childhood," while the aggravating factors focused on Barnes' criminal conduct, including the pecuniary motive for the murders, that it was part of a course of violent criminal conduct, and its "especially heinous, atrocious, or cruel" nature. J.A. 2452.

In sum, these additional factors reinforce the conclusion that the jury was "capable and willing to decide the case solely on the evidence before it" as opposed to having been swayed by the improper communication between Juror Jordan and her pastor. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984).

* * * *

41

Considering the nature of the external communication that occurred in this case alongside the proceedings as a whole, no "grave doubt" exists as to the harmlessness of the error. *Bauberger*, 632 F.3d at 104. To the contrary, Barnes simply did not satisfy his burden of demonstrating actual prejudice, and the district court did not err in denying his § 2254 petition.

## III.

For the reasons set forth above, I would affirm the judgment of the district court. Therefore, I respectfully dissent.